JONES, JUDGE:
On Sunday, August 20,1972, at about 1:00 p.m. Mary Janet Tabit, then eight years of age, sustained injuries while upon the premises of the respondent, the Adjutant General, at the National Guard Armory at Falls View in Fayette County, and this claim was instituted in her behalf by Louis Tabit, as her father and next friend, as well as in his own right.
A surplus Army tank was placed by the respondent on the lawn in front of the Armory, within a few feet of United States Route No. 60, sometime during the year 1968. The tank was of World War II and Korean War vintage and was displayed by the Guard as a war memorial or monument for public viewing. “Keep Off’ signs were placed on the tank, but after about three months they were removed as they were largely disregarded by the public and particularly by children, and several of the signs were torn down. As a precautionary measure, the respondent’s employees put sand in the paint used on the tank to prevent its surface from becoming slippery. No fence or other device was employed to keep the public away from the tank. Two of the employees of the respondent were on duty until 4:30 p.m. from Monday through Friday of each week, but the grounds were unattended on Saturdays and Sundays except for special events. None of the respondent’s employees was present on the day of the accident.
On the Sunday in question the Tabits had visitors from Roanoke, Virginia, and Janet asked her father’s permission to take three of the visiting children, ages eight to twelve or thirteen, to the Armory, a short distance from their home, to show them the tank “because they never had seen an Army tank before”. Permission was given with the admonition that they must not climb on the tank. However, the attraction apparently was too appealing to the *175 visiting children, who climbed on the tank, and Janet, also disobeying her father, followed them. She described her fall as follows:
“And there’s a back part of the tank we always used as a slickey slide and I was getting ready to go down the slickey slide and my foot caught on this bolt sticking up and I fell and I fell on my elbow.”
Janet was back at her home holding her injured left arm fifteen to twenty minutes after she had left for the Armory. Her father immediately took her to the Montgomery General Hospital where Janet’s arm was x-rayed, but no orthopedic surgeon being available there, she was then taken to the Charleston General Hospital where she was attended by Dr. Jack Pushkin.
Dr. Puskin testified that Janet was admitted to the hospital on August 20,1972, with a displaced supracondylar fracture of the left elbow. He described the fracture as involving the bone of the upper arm and explained that “the lower end of that bone just above the elbow was broken into (sic) and displaced and required general anesthetic and had to be set and put in traction,” with a pin through the elbow. On September 15,1972, she was placed in a cast and was discharged from the hospital the next day. Dr. Pushkin continued to attend Janet as an outpatient approximately every four weeks until February 9, 1973, and he again examined her on the day of the hearing. Dr. Pushkin "stated that Janet had healed well .but she had some unevenness in the growth plate in her elbo.w causing her arm to turn in slightly, the elbow turning out from her body. He further noted that if both arms were held together and compared one with the other, the deformity was obvious, and this was demonstrated to the Court at the hearing. The doctor termed the injury as permanent but would not predict whether the condition might worsen. He said Janet should be watched until she had finished her growth at approximately fifteen years of age at which time the efficacy of a further surgical operation should be determined.
Another orthopedic surgeon, Dr. Sitaram Nayak, examined Janet on three occasions, the first time on October 12,1974, and last on September 23, 1975. In his opinion Janet’s deformity will increase and another operation at age fifteen or sixteen is indicated as probable. Special damages were proved in the amount of $2,204.89, and Dr. Nayak estimated the cost of future surgical and hospital services at $2,150.00.
*176 A pertinent and leading case in West Virginia is that of Sutton v. Monongahela Power Co., 151 W.Va. 961, 158 S.E. 2d 98 (1967) from which we quote the following:
“Although the Attractive Nuisance Doctrine is not recognized in this State, this Court has adopted a rule quite similar to that Doctrine and has held that where a dangerous instrumentality or condition exists at a place frequented by children who thereby suffer injury, the parties responsible for such dangerous condition may be held liable for such injury if they knew, or should have known, of the dangerous condition and that children frequented the dangerous premises either for pleasure or out of curiosity. Love v. Virginian Power Co., 86 W.Va. 393, 103 S.E. 352, Waddell v. New River Co., 141 W. Va. 880, 93 S.E. 2d 473; Hatten v. Realty Co., 148 W. Va. 380, 135 S.E. 2d 236. Under this doctrine where the defendants know or should know of such dangerous instrumentality and the repeated presence of children, the mere fact that they are trespassers does not bar recovery. 38 Am. Jur., Negligence, §118; Parsons v. Applachian Electric Power Co., 115 W. Va. 450, 176 S.E. 862; Waddell v. New River Co., supra.”
With respect to Janet’s status as a trespasser, as respondent’s counsel stoutly contends she was, we point out that this was not private property, but was open to the public, including small children, without any limit or restraint. See Rine v. Morris, et al., 99 W. Va. 52, 127 S.E. 908.
The respondent further contends that the Army tank was no more a “dangerous instrumentality” than a statue on a Courthouse lawn. However, this instrument of war, known even to children as a fighting machine for killing and destruction, certainly would be more exciting and inviting to danger than a statue of Senator J. Phineas Foghorn.
We also believe that the defense of contributory negligence does not apply in this case because the presumption that an eight year old may not be guilty of contributory negligence has not been rebutted by the respondent.
Normally, we would be inclined to-agree with the respondent’s position that a stationary object which appears to be reasonably safe for its intended purpose and free of structural or design defect, would not be held to be a dangerous instrumentality under the definitions laid down by our Supreme Court of Appeals. However, *177 we feel that this case is unique and based on evidence and reasoning hereinafter outlined does come within the rule.
We cite excerpts from the testimony of Sgt. Charles L. Hardy, custodian of the National Guard Armory from 1966 to the date of the hearing of this case and a witness for the respondent, as follows:
“A As I stated before, during the weekly hours, if there’s any children out there at all we go out there and if they’re on the tank we explain the dangers of the tank and we politely ask them would they mind getting off. I have went out there many times and have assisted people who have stopped by to take pictures and assist in putting the children on the track and standing there watching for their safety.”
“A Because as I stated, sir, before we wasn’t quite sure exactly how to go about mounting this piece of equipment on the lawn, what could be done, you know, as far as protection to the children. So we took it upon ourselves to put signs up until we got notice from the Adjutant General’s office of the proper procedures.”
“A I explained the articles that’s on the track that they can get their clothing on, the dangers of slipping and could injure themselves.”
“Q Okay, in other words you sand anything that somebody might climb on whether it be an active truck or a monument set out there somewhere?”
“A Right.”
“Q So then by that you anticipated people would be climbing on it, didn’t you?”
“A Right.”
“Q And by your own explanation it can be dangerous to climb on that tank, can it?”
“A Yes, sir.”
“Q And in fact it was dangerous to little Janet Tabit, wasn’t it?”
“A Yes, sir.”
The following statement with reference to knowledge of danger appears in Section 72, 57 Am. Jur. 2d, Negligence:
*178 “As hereinbefore stated, the duty to use care is based upon actual or imputed knowledge of danger. It is also true that the care which must be exercised in any particular situation is in proportion to the actor’s knowledge, actual or imputed, of the danger to another in the act to be performed. The degree of care necessary to constitute the ordinary care required of a person upon any particular occasion is measured by reference to the circumstances of danger and risk known to such person at the time. Conduct which will be considered extremely careful under one condition of knowledge, and one state of circumstances, may be grossly negligent with different knowledge and in changed circumstances. The consequence likely to be the result of an act or omission is a fact to be taken into consideration in determining the kind and amount of caution to be exercised. The degree of care required to be used in any given case to avoid the imputation of negligence must be according to the circumstances or in proportion to the danger reasonably to be anticipated — such care as is ordinarily sufficient under similar circumstances to avoid danger and secure safety. Where a danger actually is foreseen, the duty is imposed to adopt every possible precaution to avoid an injury therefrom.” (Emphasis supplied.)
The respondent in this case has admitted knowledge of the frequent presence of children on and about the Army tank, and its employees gratuitously undertook to provide for their safety by mixing sand in the paint, providing “Keep Off’ signs which after a time were determined to be ineffectual, and verbally warning' children of the dangers of the admittedly fascinating machine. While the tank may not have been dangerous in the abstract, there was an obvious subjective appreciation of danger on the part of the respondent, and the Court finds that the respondent assumed the duty of providing for the safety of children known to frequent and climb on the tank which in so many ways it acknowledged to be dangerous. The mere removal of the “Keep Off’ signs indicates acquiescence in the children’s playful conduct, and adds support to the conclusion that respondent’s efforts to protect the children from falling were insufficient. The respondent having assumed the duty of providing for children’s safety and having committed acts to that end, the Court believes that the claimants are entitled to rely on such assumption of duty. In the circumstances, an attractive and relatively inexpensive fence would have solved the problem.
13 M.J., Negligence, Section 10, states that the standard of care *179 under a gratuitous duty is less than that required under a legally required duty; but here we are dealing with children who generally are entitled to a greater degree of care. In this case we believe the standard of ordinary care applies. Under a duty of ordinary care involving the danger of a fall, we hold that the respondent breached that duty by employing inadequate means to prevent the fall which injured Janet Tabit.
Considering all the facts and circumstances, the Court is of opinion that the respondent’s acts and omissions proved in this case constitute such negligence as entitles the claimants to recover, and awards are hereby made to Mary Janet Tabit in the amount of $12,150.00, and to Louis Tabit in the amount of $2,204.89, which includes $2,150.00 for future surgical and hospital services which the Court believes will be necessary.
Awards: Mary Janet Tabit — $12,150.00.
Louis Tabit — $2,204.89.